UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

GWENDOLYN J. ALLEN                    CIVIL ACTION NO. 6:20-cv-01468

VERSUS                               JUDGE JUNEAU

COMMISSIONER OF THE                   MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, and for the reasons set forth below, it is recommended that the Commissioner's

decision should be affirmed.

## Administrative Proceedings

The claimant, Gwendolyn J. Allen, fully exhausted her administrative

remedies before filing this action.  She filed an application for disability insurance

benefits, alleging that she became disabled on January 20, 2018.[1]  Her application

was denied.[2]  She requested a hearing, which was held on June 25, 2020 before

---

[1]     Rec. Doc. 9-1 at 160.

[2]     Rec. Doc. 9-1 at 59, 72.

Administrative Law Judge Steven M. Rachal.[3]  The ALJ issued a decision on July 10, 2020, concluding that Ms. Allen was not disabled within the meaning of the Social Security Act from January 20, 2018, the alleged disability onset date, through March 19, 2019, the date on which she was last insured.[4]  Ms. Allen asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis to do so.[5]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review.[6]  Ms. Allen then initiated this action, seeking judicial review of the Commissioner's decision.

## Summary of Pertinent Facts

Ms. Allen was born on May 14, 1961.[7]  At the time of the ALJ's decision, she was 59 years old.  She graduated from high school and obtained vocational school certification as a secretary.[8]  Before the alleged onset of disability, she worked as a transcriptionist in a hospital and for a private investigation firm, as a medical

---

[3]     A transcript of the hearing is found in the record at Rec. Doc. 9-1 at 30-58.

[4]     Rec. Doc. 9-1 at 21.

[5]     Rec. Doc. 9-1 at 5.

[6]     *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]     Rec. Doc. 9-1 at 60.

[8]     Rec. Doc. 9-1 at 35, 188.

assistant, and as a patient registrar in a hospital.[9]   She alleged that she became disabled on January 20, 2018 due to severe chronic asthma.[10]

On January 14, 2016, Ms. Allen saw nurse practitioner Leah Trahan[11] with complaints that postnasal drip and congestion had triggered asthma symptoms including cough, chest tightness, and wheezing.  She was using an Albuterol inhaler every six hours with relief.  She began using an Advair inhaler twice a day when her symptoms started as well as Mucinex.  The assessments were unspecified asthma, uncomplicated, and cough.  She had been using Advair as needed but was strongly advised to use it only twice per day.  She was started on Tessalon Perles, Zithromax, Singulair, and Prednisone.  It was noted that she had a history of thyroid disease and shingles.  She was taking Levothyroxine Sodium for her thyroid condition and Celexa, an antidepressant.

When Ms. Allen saw nurse practitioner Kim Guiseon on February 4, 2016 for medication refills, she reported being unable to buy Advair for asthma management.[12]   Inspiratory wheezing was noted.  She was prescribed Flovent, ProAir, and Trazodone (for insomnia).

---

[9]      Rec. Doc. 9-1 at 35-40, 217.

[10]     Rec. Doc. 9-1 at 60.

[11]     Rec. Doc. 9-1 at 322-323.

[12]     Rec. Doc. 9-1 at 320-321.

Ms. Allen again saw nurse practitioner Guiseon on February 24, 2016.[13]  Her chief complaints were asthma, increased use of an inhaler, and occasional shortness of breath.  She was using ProAir ten times per day.  Examination showed that she was wheezing.  The assessment was mild persistent asthma without complication.  She was given a Dexamethasone injection, started on Deltasone, and was to resume taking Advair for managing her asthma and ProAir/Albuterol nebulizer treatments for exacerbation of her symptoms.

Ms. Allen saw nurse practitioner Trahan again on May 16, 2016.[14]  She reported swelling of both legs at the end of a work shift, which resolved with elevating her legs, a night of rest, or a day off work, as well as a red rash on her legs.  She reported that she was not able to afford maintenance drugs prescribed for her asthma but was using an inhaler.  She reported that Trazadone helped her insomnia, Lexapro was not helping her depression, and she often forgot to take Synthroid for her thyroid condition.  No wheezes were detected upon examination.  Trazadone and ProAir were refilled and the Celexa dosage was increased.

Ms. Allen saw nurse practitioner Josie Tappel on June 3, 2016.[15]  She complained of having earache, sore throat, postnasal drip, and shortness of breath

---

[13]     Rec. Doc. 9-1 at 318-319.

[14]     Rec. Doc. 9-1 at 314-316.

[15]     Rec. Doc. 9-1 at 310-312.

despite using her nebulizer and ProAir.  She was diagnosed with allergic rhinitis, otitis externa of the right ear, and moderate persistent asthma with acute exacerbation.  Celexa was still among her listed medications, and her mood and affect were appropriate.  She was given two injections, an antibiotic was prescribed, and she was started on Mometasone Furo-Formoteral for inhalation therapy.

Ms. Allen saw nurse Tappel again on July 18, 2016,[16] complaining of a frequent cough and chest tightness.  She reported that she had not filled the steroid inhaler prescribed at her last visit due to cost, she was out of Zyrtec, and she was not taking Singulair regularly.  Examination showed wheezing.  The assessment was asthma exacerbation.  She was prescribed Advair and Prednisone and advised to restart Zyrtec and Singulair.  She was still taking Celexa, her mood and affect were appropriate, and she was negative for anxiety and depression.

On April 26, 2017, Ms. Allen saw nurse practitioner Amanda Duplantis for refills of her asthma medication.[17]   Upon examination, her lungs were clear to auscultation bilaterally, she had a regular breath rate and effort, and no wheezing, ronchi, or rales were detected.  She denied anxiety, depression, focus problems, and poor concentration.   She was assessed with seasonal allergic rhinitis, hypothyroidism, moderate persistent asthma with acute exacerbation, insomnia,

---

[16]        Rec. Doc. 9-1 at 307-309.

[17]        Rec. Doc. 9-1 at 304-306.

unspecified depression, and dysthymic disorder.  Lab work was ordered, and her medications were refilled.

On July 4, 2017, Ms. Allen was seen by physician's assistant Matthew Latiolais at Lourdes After Hours in Carencro, Louisiana.[18]  She reported having asthma, sinus pressure, nasal congestion, postnasal drip, and cough.  Her breathing was normal and no wheezing or ronchi were detected.  She was given a Dexamethasone injection.  She was diagnosed with acute sinusitis and acute upper respiratory infection.  An antibiotic and a steroid medication were prescribed.

On September 13, 2017, Ms. Allen again saw nurse practitioner Duplantis.[19] She reported that she had not obtained the lab work ordered at her previous visit because she lost the order.  She complained of fatigue, sinus pressure, and cough and requested medication refills.  She denied anxiety, depression, focus problems, and poor concentration.  Her affect was normal.  Examination showed normal breathing, and she was clear to auscultation with no wheezes, rhonchi, or rales.  She was assessed with seasonal allergic rhinitis, hypothyroidism, moderate persistent asthma with acute exacerbation, depression, and insomnia.  Lab work was again ordered. She was started on Synthroid for her hypothyroidism, and her Singulair, Trazadone, and ProAir prescriptions were refilled.

---

[18]      Rec. Doc. 9-1 at 437-439.

[19]      Rec. Doc. 9-1 at 293-303.

Ms. Allen was scheduled to see pulmonologist Dr. Justin Ardoin on October 13, 2017 but she canceled the appointment.[20]

On February 2, 2018, Ms. Allen was seen by physician's assistant Erricka Forrest at Lourdes After Hours in Carencro, Louisiana, for asthma.[21]  Ms. Allen reported that she was not wheezing, coughing, or short of breath.  There was no sign of respiratory distress, and her chest was clear to auscultation bilaterally.  She reported that she had recently lost her job, would soon lose her insurance, and asked for medication refills.  Advair, ProAir, Singulair, Albuterol Sulfate, and Levothyroxine were refilled.

On March 9, 2018, Ms. Allen saw nurse practitioner Shanone Chatman-Ashley at SWLA Center for Health Services in Lafayette, Louisiana, complaining of exacerbation of her asthma symptoms including coughing, wheezing, and shortness of breath.[22]  The nurse's assessment was mild intermittent asthma with acute exacerbation.  She refilled Ms. Allen's prescriptions, which were Albuterol Sulfate to be inhaled every four hours, ProAir to be inhaled every six hours, and Qvar to be inhaled one or twice daily.  She also started Ms. Allen on Prednisone.

---

[20]     Rec. Doc. 9-1 at 421.

[21]     Rec. Doc. 9-1 at 434-436.

[22]     Rec. Doc. 9-1 at 379-381.

On June 10, 2018, Ms. Allen was seen in the emergency department at University Hospital & Clinics in Lafayette, Louisiana.[23]  She arrived by ambulance with shortness of breath and was given a nebulizer treatment in route to the hospital. She was coughing, wheezing, and having difficulty breathing.  She reported that she was using nebulizer treatments more frequently along with an Albuterol inhaler, but was not using Advair or another medication she had been prescribed because she had lost her insurance and could not afford them.  Examination showed mild expiratory wheezes.  A chest x-ray showed no acute cardiopulmonary process but mild chronic obstructive pulmonary changes.  She was diagnosed with acute bronchitis and acute asthma exacerbation and discharged.  She was prescribed Prednisone, Tessalon Perles for her cough, ProAir inhaler for wheezing, and Levaquin (an antibiotic).

Ms. Allen saw nurse Chatman-Ashley again on June 29, 2018 for a urinary tract infection.[24]  She had no complaints of shortness of breath, chest pain, or wheezing.  Her asthma was described as severe and persistent.

Ms. Allen returned to nurse Chatman-Ashley on July 25, 2018.[25]  She reported that helping her daughter move had caused coughing and chest tightness.  She denied

---

[23]     Rec. Doc. 9-1 at 349-358.

[24]     Rec. Doc. 9-1 at 376.

[25]     Rec. Doc. 9-1 at 373-375.

chest pain and shortness of breath.  Her lungs were clear to auscultation bilaterally with no wheezes, rales, or rhonchi.  She was assessed with mild asthma with exacerbation and cough.  She was given a steroid injection, her ProAir and Qvar were refilled, and she was prescribed medication for her cough.

On December 12, 2018, Ms. Allen saw nurse Chatman-Ashley for medication refills.[26]  She had no complaints, no chest pain, no coughing, no shortness of breath, and no wheezing.  Her lungs were clear to auscultation bilaterally.  The nurse's assessments were hypothyroidism and uncomplicated asthma.

On January 2, 2019,[27] Ms. Allen went to the emergency department at University Hospital & Clinics with difficulty breathing, wheezing, and respiratory problems that began two days earlier.  Upon examination, her breath sounds were equal, her chest wall expansion was symmetrical, her respirations were regular, her respiratory distress was mild, there were moderate posterior wheezes, but no crackles, rales, or rhonchi.  She displayed an appropriate mood and affect.  She was given oxygen and a beta-agonist nebulizer treatment.  She was diagnosed with asthma exacerbation and discharged with prescriptions for Prednisone and DuoNeb inhalation solution.

---

[26]     Rec. Doc. 9-1 at 370-372.

[27]     Rec. Doc. 9-1 at 343-349.

Ms. Allen returned to nurse Chatman-Ashley on February 27, 2019 for asthma management and medication refills.[28]  She reported feeling bad over the weekend but was better and denied any shortness of breath, wheezing, or chest pain.  It was noted that "overall" she was "doing well."  The assessment was uncomplicated asthma.  Her Albuterol Sulfate, Qvar, and Pro Air prescriptions were refilled.

Ms. Allen saw nurse Chatman-Ashley again on March 26, 2019, for asthma management.[29]  She reported having an exacerbation of her asthma symptoms for the prior three days.  She reported shortness of breath and wheezing but no chest pain, dizziness, or fever.  There were scattered wheezes throughout her lungs.  She was given a steroid injection and a Z pack was prescribed.  The assessment was moderate persistent asthma with exacerbation.  She was referred to a pulmonologist.

Two days later, on March 28, 2019, Ms. Allen went to the emergency room at Our Lady of Lourdes Regional Medical Center in Lafayette, Louisiana, complaining of shortness of breath and chest tightness for the past five days.[30]  She reported that medications from her primary health care provider had not improved her symptoms.  She reported a nonproductive cough that resulted in vomiting and difficulty lying down and speaking in full sentences due to shortness of breath.  She

---

[28]     Rec. Doc. 9-1 at 367-369.

[29]     Rec. Doc. 9-1 at 364-366.

[30]     Rec. Doc. 9-1 at 389-403.

was given a steroid IV and respiratory inhalant medication in the ER, and her symptoms began to improve.  She was admitted to the hospital for acute asthma exacerbation.  When she was discharged from the hospital on April 3, 2019, she had very mild diffuse wheezing and had significantly improved.  She was to taper off the Prednisone over the next two weeks and to follow up with Dr. Jason Ardoin.

On April 24, 2019, Ms. Allen saw nurse practitioner Ashley Cook at LRDS Pulmonology Services in Lafayette, Louisiana.[31]   She reported having been diagnosed with asthma as a child and living with it all her life.  She said her asthma had previously been well controlled but stated that her symptoms had gradually worsened over the past one to two years.  She reported feeling better after the recent hospitalization but continued to have ongoing problems.   She complained of shortness of breath with any type of exertion as well as wheezing, chest tightness, and a minimal cough.  She reported that her symptoms were not controlled despite compliance with inhaler therapy, and said she was using a nebulizer every three to four hours.  Examination showed no respiratory distress, normal breath sounds, no rales, and no wheezing.  She was negative for psychiatric or behavioral symptoms. The diagnoses assigned were moderate persistent asthma without complication, chronic sinusitis, chronic obstructive pulmonary disease, and hypothyroidism.  She

---

[31]     Rec. Doc. 9-1 at 412-419.

was to continue using an albuterol rescue inhaler or nebulizer as needed for symptom control and she was prescribed Symbicort for asthma maintenance therapy.  She was to return in four weeks.

Ms. Allen saw nurse practitioner Deborah Carter at Lourdes After Hours in Lafayette, Louisiana on June 28, 2019 for a bladder infection.[32]   Examination showed no signs of respiratory distress.   Her chest was clear to auscultation bilaterally and her chest appeared normal and symmetrical.

On September 29, 2019, Ms. Allen saw Dr. Cher Aymond at Lourdes After Hours for swollen, itchy eyelids.[33]   Upon examination, there were no signs of respiratory distress and her chest appeared normal and symmetrical.  Her mood and affect were normal.

On October 10, 2019, Ms. Allen again saw nurse practitioner Chatman-Ashley for a urinary tract infection.[34]   She was screened for depression and there were no indications of depression symptoms.  Her lungs were clear to auscultation bilaterally.

Ms. Allen again saw nurse Chatman-Ashley on January 28, 2020 for an exacerbation of her asthma symptoms.[35]   She complained of coughing and

---

[32]     Rec. Doc. 9-1 at 428-430.

[33]     Rec. Doc. 9-1 at 425-427.

[34]     Rec. Doc. 9-1 at 445-448.

[35]     Rec. Doc. 9-1 at 442-444.

congestion that had started about a week earlier with a head cold.  She denied shortness of breath and chest pain.  She reported that wheezing occurred when she coughed.  She was not in respiratory distress.  She reported that she had been referred to a pulmonologist but did not follow up with him because she lost her insurance and could not afford the inhaler that he prescribed.  Inconsistently, her asthma was classified as severe and persistent at one spot in the treatment notes but as mild at another.  She was given a steroid injection.  Her ProAir and Albuterol Sulfate prescriptions were refilled, and she was started on Flovent Diskus Aerosol Powder for inhalation.

On June 25, 2020, Ms. Allen testified at a hearing regarding her symptoms and medical treatment.  She stated that she was diagnosed with asthma as a young child and claimed that asthma prevented her from being a normal child.  She stated that her asthma had worsened over the past ten years, and she claimed that, at the last couple of jobs she worked, she had to take her nebulizer with her and use it at work.  She said that she could no longer exert herself with any kind of physical activity, could not be around smells or odors, and was affected by weather.  She testified that she could not clean her house, dust, vacuum, mop, or sweep.  She stated that she could not use cleaners, particularly aerosol cleaners or those with a smell.  She stated that her daughter cleaned her house and did her grocery shopping, and said that her husband also helped her.

Ms. Allen stated that saw a pulmonologist named Ashley Cook twice.  She said that the Symbicort prescribed by Dr. Cook helped.  She also said that her rescue inhaler was ProAir, she took Singulair, and she used Albuterol treatments.  She testified that she used her nebulizer three to four times per day and used her inhaler eight to ten times per day.

Ms. Allen stated that she could dress herself, brush her teeth and comb her hair, do light cooking, and do her laundry.  She watched TV, read books, used a computer, and visited with relatives by telephone.

Ms. Allen testified that she took medication for anxiety when her children were younger, but stated that she had not taken such medication for a long time and was not receiving any mental health treatment.  She testified that hypothyroidism was her only medical condition other than asthma.

She testified that she could not be around sick people, was frequently sick herself, and had often been absent from work because of her illness.

Ms. Allen now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the

proper legal standards were used in evaluating the evidence.[36]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[37]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[38]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[39]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[40]  Conflicts in the evidence[41] and credibility assessments[42] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective

---

[36]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[37]      *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[38]      *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[39]      42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[40]      *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[41]      *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[42]      *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[43]

## B.  <u>Entitlement to Benefits</u>

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[44]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[45] A claimant is disabled only if his physical or mental impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[46]

---

[43]     *Wren v. Sullivan*, 925 F.2d at 126.

[44]     See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[45]     42 U.S.C. § 1382c(a)(3)(A).

[46]     42 U.S.C. § 1382c(a)(3)(B).

## C.    <u>Evaluation Process and Burden of Proof</u>

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[47]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[48] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[49]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[50]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[51]  This burden may be

---

[47]     20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[48]     20 C.F.R. § 404.1520(a)(4).

[49]     20 C.F.R. § 404.1545(a)(1).

[50]     20 C.F.R. § 404.1520(e).

[51]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[52]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[53]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[54]

## D.    The ALJ's Findings and Conclusions

In this case, the ALJ determined, at step one, that Ms. Allen did not engage in substantial gainful activity after her alleged disability onset date of January 29, 2018. This finding is supported by substantial evidence in the record and was not challenged by Ms. Allen.

At step two, the ALJ found that Ms. Allen has the following severe impairments:  asthma and hypothyroidism.  This finding is supported by substantial evidence in the record and was not challenged by Ms. Allen.

At step three, the ALJ found that Ms. Allen has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. Ms. Allen did not challenge this finding.

---

[52]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[53]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[54]    20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

The ALJ found that Ms. Allen had the residual functional capacity to perform light work except that she can have only occasional exposure to fumes, odors, dust, gasses, or poor ventilation.  Ms. Allen challenged this finding.

At step four, the ALJ found that Ms. Allen is capable of performing her past relevant work as a dictating machine transcriber, hospital admitting clerk, and administrative clerk.  Accordingly, the ALJ did not proceed to step five and found that Ms. Allen was not disabled between January 20, 2018 (the alleged disability onset date) and March 31, 2019 (the date she was last insured).

**E.**     **The Allegations of Error**

Ms. Allen argued that the ALJ erred (1) in evaluating her residual functional capacity by failing to consider the combined effects of her severe and non-severe impairments; and (2) in failing to articulate an evidentiary basis for his conclusion that Ms. Allen can work at a light level on a regular and continuous basis.

**F.**     **Did the Residual Functional Capacity Finding Consider the Combined Effect of Severe and Non-Severe Impairments?**

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."[55]   The ALJ is responsible for

---

[55]     *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

determining a claimant's residual functional capacity.[56]  In making such a finding, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the claimant's ability to work despite any physical and mental limitations.[57]  The ALJ must consider the limitations and restrictions imposed by all of the claimant's impairments, even those that are not severe.[58]

In this case, the ALJ found that Ms. Allen has two severe impairments – asthma and hypothyroidism – as well as a non-severe impairment – depression.  Ms. Allen alleged that the ALJ erred in evaluating her residual functional capacity because his conclusion that she was capable of performing light work did not take her depression into account.   Ms. Allen is correct that the ALJ's narrative explanation for his residual functional capacity finding does not mention her depression, and the ALJ should have addressed her depression in that narrative. However, the ALJ's error was harmless and does not necessitate reversal of the Commissioner's decision or remand of this case for further agency review.

---

[56]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[57]    *Martinez v. Chater*, 64 F.3d at 176.

[58]    *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545(e)).

"Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected."[59]  In order to justify remand, the claimant must show that the agency's failure to follow a particular rule prejudiced the claimant and consequently was not merely a harmless error.  In the Fifth Circuit, an error is harmless when it is inconceivable that a different administration conclusion would have been reached absent the error.[60]

In this case, the ALJ's failure to consider Ms. Allen's depression was a harmless error.  The record shows that Ms. Allen was prescribed antidepressant medication before her alleged disability onset date.  However, there is very little evidence in the record indicating that Ms. Allen was treated for depression at any time after her alleged disability onset date.  There is no evidence in the record that she was hospitalized for depression, that she received mental health counseling, or that she treated with a social worker, psychologist, or psychiatrist for depression.  More important, there is absolutely no evidence in the record suggesting that Ms. Allen's functionality was negatively impacted by depression.  The mere presence of an illness or condition is not disabling; instead, there must be evidence that the illness

---

[59]    *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017) (citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)).  See, also, *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001) ("This Court requires. . . a showing that the claimant was prejudiced by the agency's failure to follow a particular rule before such a failure will be permitted to serve as the basis for relief from an ALJ's decision.").

[60]    See *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

or condition impairs the individual's functionality.[61]  Thus, in order for a person to be found to be disabled, his medical condition must result in functional impairments that prevent him from working.[62]  In this case, however, there are no treatment notes or other medical records setting forth any opinions concerning the effect that Ms. Allen's depression had on her ability to work.  At the hearing, she stated that her only medical condition other than asthma was hypothyroidism.  She was represented at the hearing, and her representative did not take the opportunity to ask her any questions about depression.  Therefore, the ALJ's residual functional capacity finding would not have changed if he had evaluated the effect that her depression had on her functionality.

Because procedural perfection in an administrative proceeding is not required and the ALJ's failure to include a discussion of Ms. Allen's depression in his narrative analysis of her residual functional capacity was a harmless error, the error does not require reversal of the Commissioner's decision or remand of this matter for further administrative proceedings.

---

[61]     See *Johnson v. Sullivan*, 894 F.2d 683, 685 (5th Cir. 1990).  See, also, *Hames v. Heckler*, 707 F.2d at 165.

[62]     *Hames v. Heckler*, 707 F.2d at 165 (the claimant "must show that she was so functionally impaired by her [impairment] that she was precluded from engaging in any substantial gainful activity.").

**G.**   **Did the ALJ Fail to Consider Ms. Allen's Ability to Work on a Regular and Continuous Basis?**

Ms. Allen criticized the ALJ's residual functional capacity finding on the grounds that the ALJ did not explain how the medical records showed that she was capable of working on a regular and continuing basis.  A residual functional capacity finding is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.[63] The term "regular and continuing basis" generally means eight hours per day, five days per week.[64]  In making a residual functional capacity determination, the ALJ is required to evaluate the claimant's functional limitations, explain how the evidence supports his conclusions about those limitations, and discuss the claimant's ability to perform sustained work activities on a regular and continuing basis.[65]  The claimant admitted that the ALJ discussed her medical records, but she complained that he did not explain why the residual functional capacity finding he reached contained no allowance for breaks in the work day for Ms. Allen to administer inhaled medication.

Ms. Allen testified at the hearing that, on her last job, "I had to in between patients, go find a room that was available, a consultation room, make sure I could

---

[63]    Titles II and XVI: Assessing Residual Functional Capacity In Initial Claims, Social Secuity Rule 96-8p, 1996 WL 374184, at *1.

[64]    SSR 96-8p, 1996 WL 374184, at *1.

[65]    SSR 96-8p, 1996 WL 374184, at *1.

plug up my machine and do my treatments."[66]   But she also testified that she was "only supposed to do the albuterol treatments every three to four hours."[67]   Such a treatment schedule is not inherently contrary to working on a regular and continuing basis because it would be possible to take a treatment before work, at lunch, and after work.   Most workplaces also have regularly scheduled breaks during the day.   Ms. Allen did not explain why her nebulizer treatments had to be taken during work hours rather than before work, after work, at lunch, or during regularly scheduled breaks in the workday.   Ms. Allen also testified that she used an inhaler several times a day but doing so takes only seconds and likely would not interfere with a person's ability to continue working.   More important, Ms. Allen did not show that a medical professional who examined or treated her had opined that she required breaks from work to use a nebulizer or to administer inhaled medication during the workday.   A claimant's statements about her symptoms are insufficient to establish disability.[68] A claimant's "subjective complaints must be corroborated at least in part by objective medical testimony."[69]   As the ALJ noted in his opinion,[70] however, there

---

[66]      Rec. Doc. 9-1 at 41.

[67]      Rec. Doc. 9-1 at 44.

[68]      20 C.F.R. § 404.1529(a).

[69]      *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989).

[70]      Rec. Doc. 9-1 at 19.

is no evidence in Ms. Allen's medical records establishing that any of the medical personnel who examined or treated her placed any limitations on her activities. Similarly, there is no evidence in the record that Ms. Allen's health care providers required that her nebulizer treatments occur at any particular time of day other than spaced out in accordance with the prescriptions for the medications.

Furthermore, the Fifth Circuit has specifically rejected the contention that an ALJ must, in every decision, articulate a separate and explicit finding that a claimant can maintain a job on a sustained basis.[71]  Such a finding is necessary only when the claimant's "ailment waxes and wanes in its manifestation of disabling symptoms."[72] In all other cases, even when the claimant alleges that an impairment causes good days and bad days,[73] "the claimant's ability to maintain employment is subsumed in the RFC [residual functional capacity] determination."[74]  Here, Ms. Allen has not argued that her asthma waxes and wanes and therefore requires an explicit finding by the ALJ (although the medical records have characterized her condition as mild, moderate, and severe on different dates).  Instead, she suggested that she needed

---

[71]    *Castillo v. Barnhart*, 151 Fed. App'x 334, 336 (5th Cir. 2005) (citing *Frank v. Barnhart*, 326 F.3d at 619 and *Perez v. Barnhart*, 415 F.3d at 465).

[72]    *Perez v. Barnhart*, 415 F.3d at 465 (quoting *Frank v. Barnhart*, 326 F.3d at 619).

[73]    *Perez v. Barnhart*, 415 F.3d at 465.

[74]    *Perez v. Barnhart*, 415 F.3d at 465.

time out of *every* workday to take her nebulizer treatments, arguing that "she had to use her medications, including her nebulizer, on a day-to-day basis all day."[75]  Ms. Allen did not offer any evidence that her condition waxes and wanes in frequency or intensity such that her ability to maintain employment was not adequately taken into account in the ALJ's residual functional capacity determination nor did she present any evidence that she could only work temporarily at a certain level of exertion.  Accordingly, the ALJ was not required to make a separate, specific finding concerning her ability to work on a regular and continuing basis.

Finally, the ALJ's failure to make an explicit finding about Ms. Allen's ability to work on a regular and continuing basis did not prejudice her and was, at most, a harmless error.  To be considered capable of performing light work, a person must be able to lift twenty pounds at a time, to frequently lift or carry objects weighing up to ten pounds, to walk or stand a good deal, or if sitting most of the time, to push and pull arm or leg controls over the course of an eight hour workday.[76]  There is no evidence in the record – aside from Ms. Allen's own subjective complaints – establishing that she is not able to do those things on a regular and continuing basis.  Therefore, the ALJ's failure to make an explicit finding in that regard did not

---

[75]     Rec. Doc. 10 at 7.

[76]     20 C.F.R. § 416.967.

prejudice Ms. Allen and does not require reversal of the Commissioner's decision or remand of this action.

## Conclusion and Recommendation

For the foregoing reasons,

IT IS THE RECOMMENDATION of this Court that the Commissioner's decision should be AFFIRMED, and this matter should be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[77]

---

[77] See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).

Signed in Lafayette, Louisiana, this 24th day of September 2021.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE